A91A2131. McDONNELL et al. v. ROY E. BEATTY &
ASSOCIATES, INC.
(418 SE2d 95)

POPE, Judge.

Plaintiffs Marjette Lacey McDonnell and Mitchell Todd Lacey are the surviving children of the late Dr. J. Allen Lacey and Meredith D. Lacey. Dr. and Mrs. Lacey were killed when an airplane piloted by Dr. Lacey crashed soon after takeoff from Peachtree-DeKalb Airport in DeKalb County on October 1, 1989. Plaintiffs filed suit against defendant Roy E. Beatty & Associates, Inc., alleging that the crash occurred as a result of instrument failure due to defendant's faulty maintenance of the plane. Defendant moved to dismiss the complaint on the ground that it was not subject to personal jurisdiction in Georgia. The trial court granted defendant's motion to dismiss and denied plaintiffs' motion for leave to conduct additional discovery. Plaintiffs appeal.

The record shows defendant is a Florida corporation. Defendant owned the plane and leased it to Lacey-Champion Carpets of Florida, Inc., another Florida corporation, of which Dr. and Mrs. Lacey were officers and shareholders. The plane was used primarily by the Laceys for personal trips. Pursuant to the terms of the lease, defendant had the duty to provide service and maintenance for the plane. Defendant presented evidence that its only place of business is in Florida; that it

never operated in Georgia and never bought a plane from or sold a plane to anyone in Georgia; that it never conducted or solicited business in Georgia or engaged in any persistent course of conduct in Georgia; that it never derived substantial revenue from goods used or services rendered in Georgia; and that it never engaged in consulting work or airplane management services in Georgia. The trial court found defendant's sole contact with Georgia was an isolated appraisal of an aircraft performed almost one year after the crash, and that this activity was neither substantial nor sufficiently related causally to the plaintiffs' claim to trigger personal jurisdiction.

Plaintiffs, however, argue that defendant benefitted from their parents' use of Georgia airport facilities. Plaintiffs point out that Mr. Roy E. Beatty, sole shareholder and president of the defendant corporation, was a close personal friend of their father. They argue that because Mr. Beatty was allowed to fly the plane frequently for his own use, because he accompanied Dr. Lacey on several pleasure trips to Georgia and because he knew when the defendant leased the plane that the Laceys would use the plane in Georgia then jurisdiction may be exercised over the defendant corporation because Georgia is a convenient forum in which to litigate the matter.

1. We affirm the trial court's dismissal of the complaint for lack of personal jurisdiction. The defendant in this case is a Florida corporation which merely leased an airplane to another Florida corporation. The lessee of the plane flew it to Georgia where it crashed. It is undisputed that defendant lessor conducted no business and engaged in no activity in Georgia except for an unrelated act after the crash occurred. We cannot justify the imposition of jurisdiction over the nonresident defendant because of the unilateral acts of the lessee, over which the defendant had no control.

A nonresident defendant may be held liable for a tortious injury which occurred in this state only under two circumstances: either because the injury was due to a tortious act committed by the defendant within the state (OCGA § 9-10-91 (2)) or because the injury was caused by an act or omission of the defendant outside the state and defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state . . . ." OCGA § 9-10-91 (3).

The Georgia Long-Arm Statute is different from the corresponding statute in some other states because it "requires that an out-of-state defendant must do certain acts within the State of Georgia before [it] can be subjected to personal jurisdiction." *Gust v. Flint*, 257 Ga. 129, 130 (356 SE2d 513) (1987). In Georgia, a due process analysis is appropriate only after it is first established that the nonresident defendant committed one of the acts described in the Long-

Arm Statute. Thus, the due process analysis advocated by the dissenting judges is inappropriate because the record shows the defendant in this case did not commit any act which would subject it to jurisdiction in Georgia.

In opposing the motion to dismiss, plaintiffs relied on the fact that the owner and president of the defendant corporation accompanied the owner and president of the lessee of the airplane on several pleasure trips to Georgia. Plaintiffs argue these trips somehow show that the defendant corporation engaged in activity in Georgia. These trips, however, were purely personal and arose out of the friendship between Mr. Beatty and Dr. Lacey. They in no way established a course of conduct by the defendant corporation and in no way resulted in substantial revenue to the defendant corporation. Moreover, even when Mr. Beatty accompanied Dr. Lacey on personal trips to Georgia, it was the lessee (by and through Dr. Lacey) and not the defendant corporation which controlled the plane. The dissenting opinion jumps to the conclusion that Mr. Beatty was the "alter ego" of the defendant corporation. Even if he was, it cannot be said that Mr. Beatty was acting as the alter ego of the corporation on these personal trips. Mr. Beatty's personal hunting trips to Georgia or his acts of friendship in accompanying Dr. Lacey to visit family members in Georgia in no way benefitted the corporation. Moreover, the alleged negligent act of the corporation was the improper maintenance of the airplane. The plaintiffs do not contend Mr. Beatty personally serviced the airplane. Instead, the plane was serviced by qualified aviation mechanics in the employ of the corporation. It is not Mr. Beatty, individually, who is sued, but the corporation. And the facts do not support the exercise of jurisdiction over the corporation.

The defendant's knowledge that the lessee planned to use the plane in Georgia provides no basis on which to attribute the lessee's acts to the defendant. All of the acts which occurred in Georgia were merely the *unilateral acts of the injured party*. In this case, the plane crashed in Georgia. But that was not an act of the defendant. Neither was the flying and landing of the plane in Georgia an act of the defendant. The plane was under the exclusive control of the lessee. Defendant was, in essence, an airplane dealer and the fact that it was foreseeable that the party to whom it leased the plane would fly the plane to Georgia is an insufficient basis upon which to impose jurisdiction in Georgia. To do so would violate the nonresident defendant's right to due process because it does not establish the required minimum contacts with this state. The facts of this case are similar to those in *World-Wide Volkswagen Corp. v. Woodson*, 444 U. S. 286 (100 SC 559, 62 LE2d 490) (1980), in which the United States Supreme Court held that Oklahoma did not have jurisdiction over an automobile dealer and a regional automobile distributor, both located

in New York, simply because it was foreseeable that the automobile sold to plaintiffs in New York could be transported to Oklahoma and involved in an accident there. "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." Id. at 297. The facts establish that defendant committed no tortious act in Georgia out of which the injury arose. Thus, jurisdiction may not be imposed pursuant to subsection (2) of the Long-Arm Statute.

Neither can it be said that the defendant conducts business in Georgia or derives substantial revenue "from goods used or consumed or services rendered in the state," as set forth in subsection (3) of the Long-Arm Statute. The plane was leased for a flat monthly rate; no additional charge was made for miles flown or hours of use. Defendant lessor made no more money when the plane was flown to Georgia, or any other jurisdiction, than it made when the plane was sitting idle in Florida. Unlike the facts in this court's recent opinion of *Showa Denko K.K. v. Pangle*, 202 Ga. App. 245 (414 SE2d 658) (1991), this is not a case in which the defendant introduced a product into the stream of commerce and therefore availed itself of the market for its product in Georgia. Thus, the plaintiffs' attempt to analogize this case to "stream of commerce" cases is misplaced. Rather, defendant merely leased a plane in Florida to another Florida resident. Naturally, the lessee could use the plane anywhere it wished. In this case, the lessee unilaterally chose to use the plane in Georgia. That the defendant knew the lessee would use the plane in Georgia makes no difference: the act of bringing the plane into this forum cannot be attributed to defendant lessor, nor did it benefit the defendant in any way.

It is true, as plaintiffs argue, that a single event may be sufficient to impose jurisdiction over an out-of-state defendant under the Long-Arm Statute, but that event must be an *act* of the *defendant*. "[A] single *act by the nonresident* in the forum . . . may satisfy the 'minimum contacts' test." (Emphasis supplied.) *Shellenberger v. Tanner*, 138 Ga. App. 399, 404 (227 SE2d 266) (1976). Jurisdiction is not appropriate where, as here, the nonresident defendant's only connection with the state was due to the unilateral acts of the plaintiff. "[A] mere demonstration that an injury has occurred here due to an act or omission by a nonresident outside this forum does not necessarily show that the defendant had such 'contact' with Georgia to confer jurisdiction over him, i.e., that he has purposely availed himself of the privilege of conducting some activity here rather than being merely involved in a 'connection' with a forum plaintiff due to [the injured party's] unilateral actions within the state." Id. at 409.

Contrary to plaintiffs' argument, the facts involved in this court's earlier opinion in *Value Engineering v. Gisell,* 140 Ga. App. 44 (230 SE2d 29) (1976) are distinguishable and the holding in that case does not require the exercise of jurisdiction in this case. In *Value Engineering,* the nonresident defendant "took affirmative action in introducing an allegedly defective and dangerous article into the stream of commerce" by *shipping* the goods via a bill of lading indicating that they would be routed through Georgia. Id. at 47. In this case, however, the plane ended up in Georgia through no affirmative action of the defendant. The plane was not transported into Georgia by the defendant on its way to delivery to a customer in another state. Consequently, we agree with the trial court that jurisdiction cannot be imposed.

2. We also affirm the trial court's denial of plaintiffs' motion for leave to conduct additional discovery which was filed after the court had already granted defendant's motion to dismiss. The motion to dismiss was filed January 24, 1991. The trial court issued a consent order extending the time in which plaintiffs could respond to the motion. In plaintiffs' brief in response to the motion to dismiss, filed March 19, 1991, plaintiffs asked the trial court to withhold ruling on the motion for 60 days until further discovery could be conducted. The transcript of the hearing on the motion, held May 8, 1991, indicates plaintiffs requested no further continuance before ruling on the motion. The order dismissing the case was issued June 25, 1991, over 90 days from the date plaintiffs' brief was filed requesting an additional 60 days in which to pursue further discovery. Plaintiffs were afforded a reasonable opportunity to conduct discovery in response to defendant's motion and we fail to see how plaintiffs were prejudiced by the trial court's denial of the motion for leave to conduct additional discovery.

*Judgment affirmed. Sognier, C. J., Carley, P. J., Beasley, Cooper, Andrews and Johnson, JJ., concur. McMurray, P. J., and Birdsong, P. J., dissent.*

BIRDSONG, Presiding Judge, dissenting.

The facts in evidence are not as they have been perceived by the majority and the legal analysis is, in our opinion, incorrect.

The majority has failed to follow the rule in *Beasley v. Beasley,* 260 Ga. 419, 420 (396 SE2d 222) as to construction of the evidence on appeal of these cases. The deposition of Mr. Roy E. Beatty, Sr., establishes that defendant corporation, of which he is the sole shareholder, bought this airplane with Dr. Lacey's money, in January 1989, at the request of Mr. Beatty's personal friend Dr. Lacey, and for the use of Dr. and Mrs. Lacey in their personal affairs, which, as defendant corporation immediately knew, foresaw, expected and intended, would

include frequent visits to Dr. Lacey's mother in Calhoun, Georgia, and the couple's daughter in Atlanta and other pleasure trips in Georgia. Further, defendant's arrangement with Dr. Lacey was that in exchange for defendant's serving as the registered owner with the Federal Aviation Agency (F.A.A.) for tax purposes and providing maintenance to the plane, defendant's president Mr. Beatty would have full use of the plane for his own purposes. Although defendant bought the plane in January 1989, and from that time both Dr. Lacey and Mr. Beatty used it regularly, including in Georgia, the lease was not entered into until April 1989.

When asked why the defendant purchased this plane, Mr. Beatty testified: "I am in the aviation business. Specifically for Allen Lacey." Asked whether "he" was acting "as Dr. Allen Lacey's agent to purchase that plane," Mr. Beatty replied "No, just a friend." He testified that the defendant was not in the market for an additional plane and bought this plane for Dr. Lacey at his request. Mr. Beatty testified that the business of defendant, is "aircraft consulting and management and appraising service." He described this to mean "not much . . . to consult with people in the purchase of an aircraft to do the job that they have conceived they want to do, managing their flight department such as maintenance, flight crews, et cetera. . . ."

Mr. Beatty testified that Dr. Lacey's carpet business was closed out "by the time he bought — or we bought that airplane." Defendant purchased this plane because Dr. Lacey wanted a large plane; Mr. Beatty had conversations with Dr. Lacey regarding the type of aircraft Dr. Lacey wanted to buy.

Mr. Beatty never testified he was an "airplane dealer." As to who held title to the plane, he said there is no title to a plane but that defendant was registered as owner with the F.A.A., and "[a]n aircraft dealer doesn't come under the same heading as a private owner. A private owner has to pay a Florida sticker tax." Although defendant was the registered owner, "Dollars and cents was Dr. Lacey's money."

Prior to the purchase of the airplane, Mr. Beatty knew that Dr. Lacey was originally from Georgia; that Dr. Lacey took frequent trips to Calhoun, Toccoa and Atlanta, Georgia to see relatives; that Dr. Lacey's parents lived in Calhoun; and that Dr. Lacey would fly the plane to and in Georgia.

Mr. Beatty testified the defendant received no financial or business benefit from its purchase of this plane and received no remuneration for maintenance of the plane except reimbursement of expenses. He said he received no benefit except friendship from Dr. Lacey's lease, and he did "not particularly" consider it a benefit that the plane was available for his use. But when he earlier testified that he (the corporation) did not make money off this lease and the maintenance cost him money, and when asked why he would "do such a

strange thing," he said: "I had the use of his airplane if I needed to use it for just putting fuel in it."

When asked why his sons T. J. or Roy Jr. would accompany Dr. Lacey on a flight to Georgia, Mr. Beatty stated: "We prefer to have two people on board if there's weather involved."

Although defendant purchased the plane in January 1989, the lease was not entered into by Mr. Beatty and Lacey Champion of Florida until April 1989. The flight logs show that on January 14-15, 1989, Mr. Beatty and Dr. Lacey flew the plane with three passengers. On January 22, Dr. Lacey and his friend Dr. Barnett flew the plane to Albany, Georgia, apparently on a hunting trip. On January 27-29, Dr. Lacey and Mr. Beatty flew to Calhoun, Georgia; Mr. Beatty testified the only reason he ever flew to Calhoun with Dr. Lacey was to visit Dr. Lacey's mother. On February 18-19, Dr. Lacey and Dr. Barnett again flew to Albany. On February 22-23, Mr. Beatty and Dr. Lacey again flew to Calhoun. On March 7, Dr. and Mrs. Lacey and Barnett flew to Peachtree-DeKalb Airport in Atlanta. On March 25, Dr. Lacey and Mr. Beatty flew to Toccoa, Georgia. On March 31-April 2, Dr. Lacey flew to Calhoun, then from Calhoun to Atlanta.

After the lease was formed in April 1989, Mr. Beatty and Dr. Lacey flew to Calhoun, Georgia, on April 18. On June 1, Dr. Lacey and Dr. Barnett flew to Peachtree-DeKalb Airport in Atlanta, and returned to Florida. The next day, Mr. Beatty and his son, T. J., flew again to Peachtree-DeKalb with two passengers and returned to Florida with three passengers. As to that trip with his son, Mr. Beatty said, "we picked up [Mrs. Lacey's] daughter and son-in-law and brought them back to Orlando." On July 3-4, Dr. Lacey flew to Peachtree-DeKalb and back to Florida. On August 12-13, Dr. Lacey flew to Atlanta and returned to Florida with a passenger. On July 28, Dr. Lacey and Mr. Beatty flew to Toccoa, Georgia, and returned July 30. On August 18-21, Dr. Lacey flew to Toccoa, with Mr. Beatty's son, Roy Jr. Mr. Beatty testified he and Dr. Lacey had vacation homes in North Carolina and their flights to Toccoa were to visit these homes "for weekend pleasure."

On August 25, 1989, Dr. Lacey flew to Toccoa, Georgia, with three passengers; on August 27, he flew from Toccoa to Calhoun, Georgia, and on August 28 returned to Florida. On August 31, Dr. Lacey flew to Toccoa, where the plane remained until September 5, when he flew to Calhoun and then to Florida. The next day, Dr. Lacey again flew to Calhoun and returned to Florida with a passenger. On September 22, Dr. Lacey and Dr. Barnett flew to Albany, Georgia, and returned to Florida on September 24. On the next Georgia trip, Dr. and Mrs. Lacey were killed in the crash shortly after takeoff from Peachtree-DeKalb Airport.

Under the lease, "Lacey Champion of Florida" paid the defend-

ant $8,361.67 the first month (April 1989) and $2,900 per month thereafter. Defendant provided risk and liability insurance for the plane, with the lessee as an insured. Mr. Beatty testified the defendant put no restrictions on where the plane could be flown; except for the insurance restrictions, Dr. Lacey was free to fly the plane anywhere. The question was asked: "Or yourself acting on the company's behalf?" He replied, "It's all the same thing."

The flight logs indicate that from the time the plane was bought by defendant in January 1989, until it crashed, defendant's president Mr. Beatty or his sons, and "Rick," "J. Bowers" and "Klinger" flew the plane some 20 times, charging the gasoline to "Hardware Services" which is not shown to be connected with Dr. Lacey, or to "EAC." On one occasion Mr. Beatty and his family flew to Georgia to attend his son's wedding. At least once, Mr. Beatty flew the plane and charged the gasoline cost to defendant corporation.

When Dr. Lacey flew to Georgia or alone anywhere, gasoline was charged to "Lacey" or "LC." Dr. Lacey and Mr. Beatty flew together to places other than Georgia on eight occasions, charging gasoline to "Hardware Services" on four of those occasions and to Lacey or "Lacey (EAC)" on four occasions.

According to the Supreme Court's decision in *Beasley v. Beasley*, supra at 420, "a defendant who files a motion to dismiss for lack of personal jurisdiction has the burden of proving lack of jurisdiction. [Cits.] . . . The trial court considering a motion to dismiss for lack of jurisdiction has discretion to hear oral testimony or to decide the motion on the basis of affidavits and documentary evidence alone pursuant to OCGA § 9-11-43 (b). [Cit.] If the motion is decided on the basis of written submissions alone, as was the motion in this case, disputes of fact found in the affidavits are resolved in favor of plaintiff. [Cit.] Further, if a motion is decided on the basis of the written submissions, the reviewing court is in an equal position with the trial court to determine the facts and therefore examines the facts under a non-deferential standard."

Any dispute of facts between Mr. Beatty's deposition testimony and his affidavit in which he states in a conclusory way that except for an appraisal in October 1990, the defendant does no business and engages in no persistent course of conduct in Georgia, must be resolved in favor of the plaintiffs. Id. Aside from this rule, but even more so in light of this rule, Mr. Beatty's deposition testimony establishes clearly that the defendant corporation was not an "airplane dealer" who merely leased a plane to an individual over whose use of the plane it had no control or knowledge.

Defendant bought this plane for Dr. Lacey in January 1989, with Dr. Lacey's money, and provided maintenance for the plane, at a loss of money, so that Mr. Beatty could have use of the airplane "just for

putting fuel in it." Defendant served as registered owner with the F.A.A. for tax purposes, but defendant was not an "airplane dealer"; defendant was in the business of "aircraft consulting and management and appraising." However, as an implied or ostensible "airplane dealer," the defendant corporation spared Dr. Lacey the tax he would have paid as a private owner under Florida law. Mr. Beatty used the plane nearly as much as Dr. Lacey did; together Mr. Beatty and Dr. Lacey often flew to Georgia to visit Dr. Lacey's mother and to drive to their North Carolina homes. Mr. Beatty benefitted substantially by the fact that the plane was available for his use merely for the cost of fuel.

When defendant bought the plane, it had complete knowledge through its officer and agent Mr. Beatty, that Dr. Lacey and Mr. Beatty intended to use the plane to fly to and land in Georgia cities and airports to visit close relatives and for weekend trips. Although the plane was bought in January 1989, and Dr. Lacey used it regularly and frequently from that time, no lease existed or was contemplated from January 1989 until April 1989. The arrangement between Dr. Lacey and Mr. Beatty for defendant to purchase, serve as registered owner of, and maintain the plane, was one of mutual benefit to Dr. Lacey and defendant, and defendant's president. This arrangement was not a transaction intended to make money for defendant, but it was legalized as a business transaction for tax purposes, for the direct and substantial benefit of defendant's president and sole shareholder, and the intended lessee.

Defendant bought the plane for and leased it to Dr. Lacey with the knowledge, foresight, expectation and direct intention that Dr. Lacey *and Mr. Beatty* would use it in Georgia, and thereby defendant corporation "engage[d] in [a] persistent course of conduct . . . in this state." OCGA § 9-10-91 (3).

Together with the allegation that defendant by faulty maintenance committed a tortious act or omission outside this state, by which it committed a tortious injury in this state, the facts in this case invoke the threshold operation of OCGA § 9-10-91 (3), which provides: "A court of this state may exercise personal jurisdiction over *any nonresident . . . if in person or through an agent*, he . . . (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor . . . *engages in [a] persistent course of conduct . . . in this state. . . .*" (Emphasis supplied.)

The evidence, construed according to the rule in *Beasley v. Beasley*, supra, shows overwhelmingly that the defendant corporation did extensive affirmative acts establishing minimum contacts in Georgia. In reaching a contrary conclusion, the majority incorrectly construes the evidence to show that all of the acts which occurred in Georgia were merely the unilateral acts of Dr. Lacey. The majority then incor-

rectly concludes that the provisions of OCGA § 9-10-91 (3) are not invoked because defendant corporation or its agent was not flying the plane in Georgia when it crashed and because defendant's president Mr. Beatty — who defendant arranged and directly expected would fly the plane in Georgia and who did regularly use the plane in Georgia — did not personally service the plane. However, the very purpose of subsection (3) of § 9-10-91 is to capture in our jurisdiction nonresident defendants who commit a tortious act or occurrence in another state, which results in tortious consequences in this state. The nonresident defendant does not have to be physically present in this state when injury results here. *Shellenberger v. Tanner*, 138 Ga. App. 399, 404 (227 SE2d 266). And we fail to see how the fact that defendant's other employees, and not its president Mr. Beatty, performed the maintenance, operates to insulate defendant from the tortious consequences of that maintenance in Georgia.

OCGA § 9-10-91 (3) does not require that a defendant's "persistent course of conduct" be one designed to make money, and we are not deprived of our proper jurisdiction by the fact that defendant lost money in this course of conduct. The Long-Arm Statute does not require that the "persistent course of conduct" of the defendant or its agent in this state must be for the purpose of "business," and we are not aware of any rationale or authority that would deny Long-Arm jurisdiction to us in a case merely because the nonresident's contacts in this state were made for it or for its president's or designated lessee's personal use or pleasure.

Although the majority concludes that the individual or personal acts of defendant's officer or agent cannot be imputed to the corporation (see *Perry Agri Distributors v. Bailey Seed Farms*, 169 Ga. App. 58 (311 SE2d 497)), Mr. Beatty testified he and defendant were "all the same thing"; he was defendant's alter ego. Through Mr. Beatty, defendant knew of the actual purpose of the arrangement between defendant and Dr. Lacey, and had foresight, expectation and intention that the plane would be used in Georgia not only by Dr. Lacey, but by its president and sole shareholder Mr. Beatty and his family.

It is not Mr. Beatty's individual acts that invoke our jurisdiction in this case. The actions of defendant corporation in purchasing this plane for Dr. Lacey and Mr. Beatty, its president and sole shareholder, maintaining it for Dr. Lacey and Mr. Beatty, and leasing it to Dr. Lacey, with knowledge, foresight, expectation and full intention that both Dr. Lacey and Mr. Beatty would fly it in Georgia, were affirmative acts of the defendant by which defendant "engage[d] in [a] persistent course of conduct . . . in this state." OCGA § 9-10-91 (3). The evidence shows not merely, as Mr. Beatty implied, that the plane was "available" to him, but that the specific deliberate purpose and intent of defendant corporation with regard to this plane was to form

an arrangement allowing Dr. Lacey to fly the plane in Georgia, in exchange for which its agent, officer and sole shareholder would and did use the plane for his own purposes. Defendant controlled how Dr. Lacey used the plane, requiring that two persons fly the plane in bad weather.

This is the view of the facts we are mandated by *Beasley v. Beasley* to adopt. The public policy of Georgia law is that our courts shall exercise jurisdiction over nonresident parties *"to the maximum extent permitted by procedural due process."* (Emphasis supplied.) *Bradlee Mgmt. Svcs. v. Cassells*, 249 Ga. 614, 617 (292 SE2d 717); *Clarkson Power Flow v. Thompson*, 244 Ga. 300 (260 SE2d 9); *Coe & Payne Co. v. Wood-Mosaic Corp.*, 230 Ga. 58, 62 (195 SE2d 399). The provision of OCGA § 9-10-91 (3) authorizing jurisdiction of nonresidents who cause injury in this state by a tortious act committed elsewhere is a liberalization of the invocation of Long-Arm jurisdiction and not a restriction on it. A "single event" may be sufficient to sustain jurisdiction based on minimum contacts under § 9-10-91 (3). *Shellenberger v. Tanner*, supra at 404. " '[W]ithin the bounds of fairness and substantial justice to the defendant, the Long Arm Statute will be applied to the limits of due process so that those who invoke the protection or benefits of the laws of Georgia, or who injure citizens or property here, will be made to answer therefor in the Georgia courts.' " *Value Engineering Co. v. Gisell*, 140 Ga. App. 44, 48 (230 SE2d 29), citing *Coe & Payne Co.*, supra; *J. C. Penney Co. v. Malouf Co.*, 230 Ga. 140 (196 SE2d 145); *Davis Metals v. Allen*, 230 Ga. 623 (198 SE2d 285).

Defendant confused the posture of this case before this court by asserting that in determining the reasonableness of invoking jurisdiction in a case, we must follow certain criteria that *Shellenberger*, supra, adopted from a North Carolina case. This assertion is a perversion of the holding of *Shellenberger*. The Georgia Supreme Court held in *Beasley v. Beasley*, supra at 421: "Due process requires that individuals have 'fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign.' [Cit.] In evaluating whether a defendant could reasonably expect to be haled into court in a particular forum, courts examine defendant's contacts with the state, focusing on whether (1) defendant has done some act to avail himself of the law of the forum state; (2) the claim is related to those acts; and (3) the exercise of jurisdiction is reasonable, that is, it does not violate notions of fair play and substantial justice. [Cits.] These three elements do not constitute a due process formula, but are helpful analytical tools which ensure that a defendant is not forced to litigate in a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts. [Cit.] The first two elements are used to determine whether defendant has established the minimum contacts

necessary for the exercise of jurisdiction. If a defendant has established minimum contacts, the court may then evaluate other factors that impact on the reasonableness of asserting jurisdiction, such as the burden on defendant, the forum state's interest in adjudicating the dispute, plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering substantive social policies. [Cit.]"

Applying these principles to the facts before us, we would conclude without question (1) that defendant did affirmative acts to engage in a persistent course of conduct in this state, by buying this plane specifically at Dr. Lacey's request, and maintaining it for his use and the use of defendant's president Mr. Beatty, while registering itself as owner with the F.A.A. so that Dr. Lacey would avoid the status of private owner and liability for tax in Florida, with knowledge and direct expectation and intent that Dr. Lacey and Mr. Beatty would fly the plane in Georgia and would land at Georgia airports and avail the plane of Georgia airport and public services and facilities, including police, fire and medical services. We would find (2) that the wrongful death claim of plaintiffs is related to these acts by defendant. We would find (3) that the exercise of jurisdiction is reasonable and does not violate notions of fair play and substantial justice, under all the "helpful analytical tools" suggested in *Beasley v. Beasley* for that determination.

The facts in the record refute the majority's characterization that this is a case where a Florida corporation "merely leased" an airplane to another Florida corporation; that defendant was an "airplane dealer"; that the introduction of this plane into Georgia was the unilateral act of the lessee over which defendant had no control or knowledge; that lessee was solely responsible for bringing the plane into Georgia and defendant did no affirmative act which placed this plane in Georgia. The sole basis for jurisdiction is not merely that it was foreseeable that the lessee would fly the plane to Georgia, but the act of bringing the plane into this forum must be attributed to the defendant.

The majority is incorrect in concluding that defendant did not benefit from this arrangement; and in any event we are not deprived of jurisdiction merely because defendant did not "benefit" from the use of the plane in Georgia, or merely because Mr. Beatty himself did not service the plane and was not piloting it when it crashed. It is not necessary to our jurisdiction that defendant or its agents be physically in Georgia when the crash occurred, or when the tortious act occurred, or even when the single event occurred which established minimum contacts sufficient to invoke our jurisdiction. *Shellenberger,* supra at 407.

Defendant confused the issues in this case by contending it was not "doing business" in Georgia in any case, because it did not make any money off this "lease" arrangement. This was a transaction engaged in by defendant not to make money, but specifically intended by defendant to give to its president Mr. Beatty and Dr. and Mrs. Lacey access to this airplane for their joint and separate personal use, which defendant directly foresaw and expressly expected would occur in Georgia. Defendant engaged in a "persistent course of conduct" (§ 9-10-91 (3)) in Georgia; the Code section does not require that defendant must have "benefitted" from it. Jurisdiction is invoked not by the fact that a defendant "benefits" from a persistent course of conduct in this state, but because a tortious injury or death has occurred here, when the defendant has engaged in a persistent course of conduct within this state.

The majority has incorrectly concluded that defendant was an "airplane dealer" and has incorrectly characterized the facts of this case as being similar to those in *World-Wide Volkswagen Corp. v. Woodson*, 444 U. S. 286 (100 SC 559, 62 LE2d 490), which involved the random sale of consumer goods. To buttress its contention that it did no affirmative act to place this plane in the stream of Georgia commerce, defendant relied upon that case and such other "consumer purchase" cases as *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U. S. 102, 112 (107 SC 1026, 94 LE2d 92) and our recent case of *Showa Denko K.K. v. Pangle*, 202 Ga. App. 245 (414 SE2d 658).

The majority has followed defendant's reliance on such consumer purchase cases, and concludes that "defendant committed no tortious act in Georgia," which is relevant to subsection (2) of OCGA § 9-10-91, but not to subsection (3). The majority then implies that to invoke jurisdiction under subsection (3) of the Code section, defendant must have introduced a consumer product in Georgia, e.g., by sale or by shipment. To defeat our jurisdiction in this case, the majority relies upon cases involving consumer purchase of goods, where a defendant introduced a product into the forum's stream of commerce by sale or distribution; the majority concludes we do not have jurisdiction because this defendant did not sell or distribute, or even "ship" a product through Georgia (see *Value Engineering Co.*, supra).

There is no requirement in § 9-10-91 (3) that a defendant must have sold, distributed or shipped a product in this state, or introduced goods into the stream of commerce in Georgia. Consumer purchase cases such as *Showa Denko*, supra, do not embody the only means by which "minimum contacts" and due process are analyzed, nor do they establish the singular standard by which a "persistent course of conduct" is determined under § 9-10-91 (3). Moreover, while saying this is not a consumer purchase case and pointing to *Showa Denko*, where we found jurisdiction, the majority then inconsistently

asserts this *is* a consumer purchase case like *World-Wide Volkswagen,* supra, which involved an automobile dealer (like the defendant, who the majority concludes was an "airplane dealer") who could merely "foresee" that a random consumer to whom it sold an automobile in New York might drive it to another state, and have an accident there.

We do not believe the legal principles invoked in consumer purchase cases such as *World-Wide Volkswagen,* supra; *Showa Denko,* supra; and *Asahi Metal Co.,* supra, should be interposed to cause confusion in a case which bears no factual relation to the "random" or "happenstance" (see *Showa Denko,* supra) contacts that may occur with sales and distribution of consumer goods in interstate and international settings. It is casuistical in the extreme to superimpose legal principles from dissimilar fact settings in such a way as to make *these facts* appear different than what they are.

Nevertheless, proper application of the underlying legal principles in the consumer purchase cases demands the invocation of our Long-Arm jurisdiction in this case, for it is undisputable that this defendant was not merely "aware" (*Asahi,* supra) that this plane might find its way to Georgia, nor was it "happenstance" (see *Showa Denko,* supra) that this plane flew and crashed in Georgia. Rather the defendant "engage[d] in [a] persistent course of conduct . . . in this state," OCGA § 9-10-91 (3), by purchasing the plane for Dr. Lacey and for its president's use, with the immediate knowledge, foresight, expectation and intention that the plane would be regularly used in this state by both, and would regularly use Georgia's airport and public facilities.

The foreseeability in this case was far more certain than that upon which jurisdiction was invoked in *Showa Denko,* supra, where we held " '[t]he foreseeability that is critical to due process analysis is not the mere likelihood that the product will find its way to the forum [s]tate. Rather, it is that *the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there.*' " (Emphasis supplied.) Id. at 248. This is the ultimate determination to be made in consumer purchase cases, as in all cases whatever the "course of conduct," and under this criterion, jurisdiction is properly invoked in this case by a finding of minimum contacts satisfying due process requirements. *Beasley v. Beasley,* supra at 421.

In *Value Engineering Co.,* supra, we found jurisdiction, although defendant's sole contact with this state was for a mere 80 minutes while radioactive contaminant sat in a plane's cargo hold during a lay-over at the Atlanta airport. The persistent course of conduct engaged in by the corporate defendant in this case was far more directly intended and foreseen, far more lengthy, and far more extensive in

nature.

According to the principles laid down in *Beasley v. Beasley*, supra, we would hold that Long-Arm jurisdiction of Georgia courts is properly invoked in this case and is well within the limits of procedural due process.

I respectfully dissent. I am authorized to state that Presiding Judge McMurray joins in this dissent.

DECIDED MARCH 20, 1992 —
RECONSIDERATION DENIED APRIL 3, 1992 — 

*Middleton & Anderson, Clinton W. Sitton*, for appellants.
*Neely & Player, Richard B. North, Jr., Edgar A. Neely, Jr., Lorre J. Gaudiosi*, for appellee.

